## ERVIN FULLER v. STATE.

No. A-4679.   Opinion Filed Dec. 22, 1924.

(231 Pac. 94.)

(Syllabus.)

**Appeal and Error—Sufficiency of Evidence to Support Verdict of Conviction.** Ordinarily an appellate court will not set aside the verdict of the jury for the insufficiency of the evidence, where there is some evidence in support of the material elements of the crime charged.

Appeal from District Court, Choctaw County; G. M. Barrett, Judge.

Ervin Fuller was convicted of grand larceny and he appeals. Modified and affirmed.

Warren & Welch, for plaintiff in error.

The Attorney General and G. B. Fulton, Asst. Atty. Gen., for the State.

BESSEY, J. Ervin Fuller and Al Kelley were jointly charged in an information filed in the district court of Choctaw county with grand larceny, for the theft of three automobile tires. Before the trial of the plaintiff in error Al Kelley had entered his plea of guilty, and by a judgment of the court had been sentenced to imprisonment in the penitentiary. The case proceeded to trial as to Ervin Fuller, resulting in a verdict of guilty without fixing the punishment. In due course judgment was rendered on this verdict, fixing the punishment of plaintiff in error at imprisonment in the penitentiary for a period of four years.

Practically the only question urged in this appeal by the plaintiff in error is that the evidence is insufficient to support the verdict. On the day the larceny was committed Fuller and Kelley had procured a Ford automobile, and in the course of the afternoon drove into the country to get some

whisky; as they passed along the highway, some distance from Hugo, they noticed a Chevrolet car by the roadside, where it had been left by its owner; Kelley said to Fuller as they passed that upon their return they would strip the car of its tires. They returned about 9:30 at night, while the moon was shining brightly, and Kelley, or Kelley and Fuller, as may be deduced from the evidence, were in the act of taking off these tires when they were apprehended by the son of the owner of the Chevrolet and a companion. As to just what took place at this juncture, we quote from the testimony of Lee Eden, the companion:

"By the witness: And so we went up there and asked them what they was doing; they said they was getting that car for another man; and I says, 'This car belongs to old man Norris, this is his boy.' And this one (indicating) was drunk —well, he was staggering around there right sharply, and he said, 'Well, we have made a mistake then and you can take the tires.' He just give us back the tires, and they says, 'Now, you boys just wait here a few minutes and we will try to find the right car, and we will go right along the creek, but we will come back,' and we waited until they got out of sight and taken the casings and hid them and went on home.

· "Q. Did they come back? A. No, they never come back. I looked at their car and they had one casing off, it was on the rim, right fore wheel, and I noticed the track right north to where they was getting these casings, and they had come from the north.

"Q. Which way did they tell you they had come from? A. They said they had come from Hugo.

"Q. Who did they tell you, if any one—did they say had sent them out there? A. Old man Smith, I believe they said. That they was hunting old man Smith's car. They said it must be right out along the creek and they would go up there and turn around and come back and take us home. They had come from the north, the car had, because I noticed particu-

larly the track left by the rim of the fore wheel.    I went home and called the city officers, and told them if this car come to arrest them.''

Quoting from the testimony of the son of the owner of the Chevrolet car:

''A. Well, we walked up there and they had two tires in their car—

''Q. What two tires? A. Well, they were just two of the tires.

''Q. For what car? A. Off my car, the Chevrolet.

''Q. Your car, or your father's car? A. My father's car, and they was taking—doing something to one of the others, taking it off—taking the other of ours off, and we walked up there and we asked them whose car that was, and they told us Mr. Smith's.''

From other portions of the record it appears that Kelley was the one who was actually prying off the third tire from the Chevrolet when the boys arrived upon the scene.

Plaintiff in error claims that he was a mere bystander; that he had nothing to do with the taking of the tires; that when Kelley proposed to take the tires he protested and objected.    From the portions of the record quoted, and from other portions, it appears that the witness used the pronouns ''he'' and ''they'' interchangeably, indicating that whichever was meant when the word ''he'' was used, the two were both implicated in the theft of the tires.    In many places the record shows that when the pronoun ''he'' was used, what defendant was meant was pointed out by the witness, but such demonstrative evidence does not enlighten this court as to which one was meant in such cases.

It appears that the plaintiff in error was in an advanced state of intoxication at the time of the larceny; and in the

testimony first quoted, ''and this one (indicating) was drunk —well he was staggering around there right sharply—and he said 'Well, we have made a mistake then and you can take the tires,' '' giving to this language its fair inference, it appears that witness was repeating a statement made by plaintiff in error, and that plaintiff in error was by his own admission, implicated in the taking.

That plaintiff in error was implicated is further confirmed by other circumstances appearing in the record. It seems that this Ford car belonged to a woman; that it was in a more or less dilapidated condition and not in running order; that with the woman's consent Kelley and others, probably including this plaintiff in error, procured repairs for the car and put it in running order, with the understanding that they might use the car at their pleasure. The testimony shows that Fuller and Kelley were friends, staying at the same hotel; that the trip into the country with this car to procure whisky was a joint enterprise; and that Fuller pleaded guilty to a whisky charge growing out of the trip. All these circumstances tend to confirm the direct testimony of the witnesses quoted, indicating that both men were implicated in the taking of the tires from the Chevrolet car.

Where several persons are jointly accused of the commission of a crime, it not infrequently happens that the one who has been apprehended in the actual act of commission takes all the blame and exonerates his companions in crime; and this would seem to be the situation in this case. The defendant took the stand and denied that he had anything to do with the taking of the tires; and his former codefendant, Kelley, who had already entered his plea of guilty, testified in Fuller's behalf, corroborating him in this regard.

Under circumstances like these, whether Fuller was implicated in the taking was an issue of fact for the jury. And in this case there is a special reason why the jury were better able to weigh the evidence correctly than is this court, because of the fact, as has been stated, that the record indicates that all through the trial there was demonstrative evidence, the exact significance of which does not appear of record.

But since the defendant's companion in crime was the more at fault, and probably the original instigator of the crime and the principal aggressor, we think the judgment as to this defendant, Ervin Fuller, was excessive. The punishment will therefore be modified to confinement in the penitentiary for a term of two years.

The judgment, as so modified, is affirmed.

MATSON, P. J., and DOYLE, J., concur.